Filed 7/20/21  P. v. Aguilar CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. OSCAR AGUILAR et al., Defendants and Appellants. | B301406 (Los Angeles County Super. Ct. No. BA451748) |

APPEALS from judgments of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Affirmed as modified.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant Oscar Aguilar.

Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant Esau Rios.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael

Keller and Paul S. Thies, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found Oscar Aguilar and Esau Rios guilty of first degree murder and shooting at an occupied vehicle and also found Aguilar guilty of unlawful possession of a firearm by a felon.  On appeal Aguilar and Rios raise a number of challenges to their convictions, including sufficiency of the evidence to support the finding of premeditation, evidentiary and instructional error and prosecutorial misconduct.  Except for correction of an error regarding sentencing, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Amended Information*

On January 28, 2019 Aguilar and Rios were charged in an amended information with one count of murder (Pen. Code, § 187, subd. (a))[1] and one count of shooting at an occupied motor vehicle (§ 246).  Both charges included special firearm-use allegations pursuant to section 12022.53.  Aguilar was also charged with one count of possession of a firearm by a felon (§ 29800, subd. (a)(1)).  It was further alleged each offense had been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A) & (C)).  The amended information also specially alleged Aguilar had suffered two prior serious or violent felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(j), 1170.12) and one prior serious felony conviction under section 667,

---

[1]     Statutory references are to this code unless otherwise stated.

subdivision (a), and had served three seperate prison terms for prior felony convictions within the meaning of section 667.5, subdivision (b).

2. *The Evidence at Trial*

a. *The shooting*

On the night of September 16, 2016 Carlos Segovia was in his car leaving his girlfriend's house when he saw Aguilar, Rios and Ricky Valente peering into a parked car. Segovia called his girlfriend, Kimberly Perez, and told her "some youngsters" were "snooping" into her mother's car. Perez overheard Segovia ask the men to step away from the parked car. One of the men responded, "What the fuck, you're not from around here." Perez also heard Segovia say, "Don't worry about where I'm from. I don't rep anything." Perez was able to hear some cursing before the call ended. She recalled Segovia's tone was stern, while the other men sounded aggressive.

During the exchange Valente walked down the street away from the group. Segovia followed Valente and pulled his car to the side of the road to speak to Valente through the open driver's side window. While they were talking, Aguilar ran near where Valente was standing and shot Segovia once in the head. Segovia died three days later as a result of the gunshot wound.

b. *Valente's testimony*

Valente testified he was friends with Rios, but he did not know Aguilar well. Valente believed Rios was a member of the Harpys criminal street gang based on Rios's tattoos and because Rios had encouraged Valente to join the gang. Valente believed Aguilar was a member of the Hobart criminal street gang based

3

on statements made to him by Rios.  Valente said he lived in Harpys gang territory.

On the night of September 16, 2016 Valente, Aguilar and Rios were at Aguilar's house with Valente's brother, Kevin Valente, and Valente's two cousins.  The men were drinking beer and smoking marijuana.  Valente testified he was drunk and he believed Aguilar and Rios were also drunk because they could not walk straight.  At some point the group decided to leave Aguilar's house and go to Valente's house a few blocks away.

Valente walked to his house with Rios and Aguilar.  Valente testified he knew Aguilar had a gun because the group had been discussing it and handling it earlier in the evening.  As they were walking, Segovia drove up alongside them and said, in an aggressive tone, "You guys better not be fucking with these cars."  Valente responded they were not disturbing the cars and continued walking.  Aguilar and Rios stayed to talk to Segovia.  Valente heard Rios ask Segovia, "Where are you from?"  Valente understood Rios to be asking Segovia whether he was a gang member.  Segovia answered, "I am from nowhere."  Valente then heard Rios tell Aguilar, "Pop that shit off" and heard the "click clack" sound of the slide on a handgun being pulled back to load a bullet into the chamber.

At that point Segovia drove down the street and stopped alongside Valente, who hid behind a parked car because he thought Segovia might be armed and preparing to shoot him.  Valente recalled he was hiding for "maybe thirty" seconds when Segovia saw him and asked, "Why are you kicking it with these fools?"  Valente answered, "Why are you fucking with these guys?  They are just drunk."  Segovia and Valente had been talking for

4

"thirty seconds at least" when Aguilar ran up and shot Segovia once in the head.

After the shooting Valente ran toward his house. He passed his cousins on the street, and they ran after him. He was the first to arrive home, followed by his cousins, then Aguilar and finally Rios. Valente testified the men were all very quiet and everyone seemed to be in shock. Valente did not know what happened to the gun after the shooting. Valente ultimately pleaded guilty to one count of accessory after the fact and admitted a criminal street gang sentencing enhancement.

c. *The investigation and arrests of Aguilar and Rios*

In the days following the shooting a Los Angeles Police Department homicide investigator obtained security camera footage from several businesses in the area. One of the videos, recorded at approximately 11:30 p.m. the night of the shooting, depicted four men running around the corner from the direction of the shooting followed by a fifth man walking. The homicide investigator was able to track the men to a particular house, which he later identified as the home of Valente and his brother.

On November 10, 2016 police detained Rios, Aguilar and Valente in connection with the shooting. Valente was interviewed first, and he initially said he did not know anything about the shooting. However, after an hour of questioning and being shown the surveillance footage, Valente admitted he had witnessed Aguilar shoot Segovia.

At the conclusion of his interview with police, Valente was placed in a cell with Rios for approximately one hour. Rios was then questioned and shown the surveillance videos, after which Rios was placed in a cell with Aguilar, who had not yet been questioned by police. Police recorded the conversation between

5

Rios and Aguilar with a hidden microphone.  Excerpts of that conversation were played for the jury.

While in the jail cell Rios told Aguilar that Valente had confessed to witnessing the shooting, stating, "He already fucked it up, that fool Ricky, man.  That fool fucked up. . . .  But this dumbass threw everything, fool."  Rios explained the police had told him he was being arrested for murder.  Aguilar responded that Valente should go to Mexico so he would not have to testify.  Rios then told Aguilar, "You should have just left him alone."  Later Aguilar said, "They're gonna see that they got the wrong people," and the men laughed.  Aguilar continued, "We went to go get some tacos . . . .  The word was out that it was probably a group of black people."  Rios responded, "Man, I wish I would have stuck to that story."

d.  *The gang evidence*

The parties stipulated the Hobart and Harpys gangs were both criminal street gangs for purposes of section 186.22.

Officer Rene Gonzalez of the Los Angeles Police Department testified as the People's gang expert.  In addition to his training and experience regarding gangs generally, Gonzalez had served on a task force specifically investigating the Harpys gang.  Gonzalez testified Rios had tattoos identifying him as a member of the Harpys gang, specifically the 5th Avenue clique, and Aguilar had tattoos identifying him as a member of the Hobart gang.  Gonzalez stated he was not aware of any rivalry between the Harpys and Hobart gangs, and it was not uncommon for their members to associate with one another.

Officer Gonzalez explained gangs typically claim a specific territory within which they operate without interference from other gangs.  According to Gonzalez, it is "absolutely necessary"

6

for a gang to instill fear in individuals within their territory both to discourage other gangs from encroaching on their claimed territory and to prevent the public from cooperating with police investigations into the gang. Gonzalez testified Segovia's murder occurred within Harpys's territory.

Given a hypothetical similar to the shooting in this case, Officer Gonzalez opined the shooting was committed for the benefit of, and in association with, a criminal street gang. He explained gangs obtain power through intimidation and violence; killing someone boosts an individual's status in the gang and contributes to the gang's reputation in the community. This is the case even if the individual gang member is not the shooter but has given the order for the shooting to occur. Further, even if the shooter was not acting within the territory of his own gang, the shooting still benefits him within his gang and contributes to the reputation of the gang in whose territory he acted.

Neither Aguilar nor Rios testified or presented any witnesses in his own defense.

3. *The Verdict and Sentence*

The jury found Aguilar and Rios guilty of first degree murder and of shooting at an occupied vehicle. As to those counts, the jury found true the firearm-use allegations and the allegations the offenses were committed for the benefit of a criminal street gang. The jury also found Aguilar guilty of possession of a firearm by a felon and found true the allegation the offense had been committed for the benefit of a criminal street gang.[2] In a bifurcated bench trial the court found the

---

[2] During trial Aguilar stipulated he had been convicted of three prior felonies for purposes of the gun possession charge.

People had proved Aguilar previously committed the serious or violent felony offenses and had served the prison terms alleged in the amended information.

The trial court sentenced Aguilar as a third strike offender to an aggregate indeterminate term of 100 years to life.[3]  Rios was sentenced to an aggregate indeterminate term of 50 years to life.[4]

In regard to Aguilar's sentence, despite the jury's finding the offenses were committed for the benefit of a criminal street gang, at sentencing the trial court failed to impose the 15-year minimum parole eligibility provision of section 186.22, subdivision (b)(5).[5]  (See *People v. Lopez* (2005) 34 Cal.4th 1002,

---

[3]     Aguilar's sentence consisted of 25 years to life for murder, tripled under the three strikes law, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), and a concurrent term of 25 years to life for being a felon in possession of a firearm.  The court imposed and stayed pursuant to section 654 a sentence of 70 years to life for shooting at an occupied vehicle (15 years to life pursuant to section 186.22, subdivision (b)(4), tripled under the three strikes law, plus 25 years to life for the firearm enhancement).  The court struck the section 667, subdivision (a), and section 667.5 sentence enhancements.

[4]     Rios's sentence consisted of 25 years to life for murder, plus 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1).  The court imposed and stayed pursuant to section 654 a sentence of 15 years to life for shooting at an occupied vehicle (§ 186.22, subd. (b)(4)).

[5]     Because the court imposed the section 12022.53, subdivisions (d) and (e)(1), firearm enhancement on Rios's sentence for murder, he is not subject to the 15-year minimum parole eligibility alternate penalty under section 186.22,

8

1009 [although the 15-year minimum may have little practical effect when defendant receives an indeterminate sentence of 25 years to life, the true finding under section 186.22, subdivision (b)(5), may be considered by the Board of Prison Terms when considering defendant's release date "even if it does not extend the minimum parole date per se"].)  We modify the judgment as to Aguilar and direct the trial court to correct the abstract of judgment to indicate the minimum parole eligibility date.[6]  (See *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1405 [modifying judgment to strike 10-year gang enhancements "and impose, in their place, 15-year minimum parole eligibility terms"]; *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1209 ["as to count 1, the term should have been life with the possibility of parole with a minimum term of 15 years before parole eligibility"].)

---

subdivision (b)(5).  (See § 12022.53, subdivision (e)(2) ["[a]n enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense"].)

[6]      The parties do not raise this issue on appeal.  However, we have an obligation to correct an unauthorized sentence whenever it comes to our attention.  (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1044-1045; *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6].)

## DISCUSSION

1. *Substantial Evidence Supports the First Degree Murder Conviction and the Criminal Street Gang Findings*

    a. *Standard of review*

In considering a claim of insufficient evidence in a criminal case, "a reviewing court considers the entire record in the light most favorable to the judgment below to determine whether it contains substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068-1069.) "In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Dalton* (2019) 7 Cal.5th 166, 243-244; *People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

"'"In cases in which the People rely primarily on circumstantial evidence, the standard of review is the same."'" (*People v. Salazar* (2016) 63 Cal.4th 214, 242; see *People v.*

*Brooks* (2017) 3 Cal.5th 1, 57 ["[s]ubstantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence"].) "Mental state and intent are rarely susceptible of direct proof and must therefore be proven circumstantially." (*People v. Thomas* (2011) 52 Cal.4th 336, 355.) "'An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence.'" (*People v. Elliot* (2005) 37 Cal.4th 453, 466.) "Although it is the duty of the jury to acquit a defendant if it finds the circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." (*People v. Ghobrial* (2018) 5 Cal.5th 250, 278, internal quotation marks omitted; accord, *People v. Clark* (2016) 63 Cal.4th 522, 626.)

   b. *Substantial evidence supports the jury's finding of*
      *deliberation and premeditation as to Aguilar*

   "First degree murder 'has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty.' [Citation.] These elements require 'more than a showing of intent to kill.'" (*People v. Gomez* (2018) 6 Cal.5th 243, 282.) "'"Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.'" (*People v. Brooks*, *supra*, 3 Cal.5th at p. 58.)

11

"'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] The reflection may be arrived at quickly; it need not span a specific or extended period of time." (*People v. Lopez* (2018) 5 Cal.5th 339, 354-355; see *People v. Gomez, supra*, 6 Cal.5th at p. 282 ["'"'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly'"'"].)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*) the Supreme Court "identified three categories of evidence that tend to establish a premeditated and deliberate murder—planning, motive, and method." (*People v. Ghobrial, supra*, 5 Cal.5th at p. 278; see *People v. Gomez, supra*, 6 Cal.5th at p. 282 [Supreme Court has "previously noted that evidence of planning, motive, and manner of killing is often relevant to this inquiry"].)[7] But "these factors do not '"exclude all other types and

---

[7] In *Anderson, supra*, 70 Cal.2d at pages 26-27 the Supreme Court stated, "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the

12

combinations of evidence that could support a finding of premeditation and deliberation.”’” (*People v. Lopez, supra*, 5 Cal.5th at p. 355.) Rather, “‘[t]hey are simply an “aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.”’” (*Ghobrial*, at p. 278; accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 663 [“[a]s we have repeatedly pointed out, and now reaffirm, ‘[t]he *Anderson* guidelines are descriptive, not normative. [Citation.]’ [Citation.] They are not all required [citation], nor are they exclusive in describing the evidence that will support a finding of premeditation and deliberation”].) Nevertheless, “‘[w]hen the record discloses evidence in all three categories, the verdict generally will be sustained.’” (*People v. Stitely* (2005) 35 Cal.4th 514, 543; see *People v. Disa* (2016) 1 Cal.App.5th 654, 665.)

Aguilar argues there was insufficient evidence to support a finding the murder of Segovia was deliberate and premeditated. However, viewed in light of the *Anderson* guidelines, the record amply supports the jury's finding. As to motive, a reasonable inference from the circumstances leading to the shooting is that Aguilar shot Segovia because Segovia had aggressively or sternly accused Aguilar of tampering with cars in Aguilar's neighborhood. Additional motive was provided by Rios's order to

---

nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).”

Aguilar to "pop that shit off." Aguilar disputes these motives, pointing out there was no evidence of a "preexisting motive" but only of a "spontaneous confrontation." Contrary to Aguilar's assertion, a finding of motive does not require the defendant to have known or interacted with the victim for any prescribed length of time—or, indeed, for any time at all. (See, e.g., *People v. Cardenas* (2020) 53 Cal.App.5th 102, 122 [reasonable jury could infer motive based on defendant perceiving victim as aggressor even though encounter was spontaneous, defendant and victim never spoke to one another and entire incident lasted only 30 seconds]; *People v. Martinez* (2003) 113 Cal.App.4th 400, 404, 413 [jury could reasonably infer the motive for the shooting involved gang rivalry even though encounter was spontaneous and only interaction before shooting was defendant asking, "Where are you guys from?"].)

There was also substantial evidence of planning. That Aguilar brought a loaded gun with him to walk through his neighborhood reasonably supports the inference he had planned for the possibility of a violent encounter even if he did not know he would meet Segovia. (See *People v. Salazar*, *supra*, 63 Cal.4th at p. 245 ["defendant brought a loaded gun with him to the [restaurant], demonstrating preparation" even though meeting victim was unplanned]; *People v. Lee* (2011) 51 Cal.4th 620, 636 ["defendant brought a loaded handgun with him on the night Mele was killed, indicating he had considered the possibility of a violent encounter"]; *People v. Cardenas, supra,* 53 Cal.App.5th at p. 122 ["the act of taking a loaded weapon with him to the restaurant is evidence of preparation and planning for involvement in a violent encounter" even though confrontation with victims was spontaneous].) Aguilar also pulled the slide

14

back on his gun to ensure a round was in the chamber and ran across the street to get closer to Segovia's car before shooting. These facts also provide evidence of planning. (See *Salazar,* at p. 245 ["[d]efendant and Echeverria both cocked their guns as they approached Guevara, strongly suggesting they were contemplating a shooting"].)

Finally, the manner of the murder supports a finding of deliberation and premeditation. Despite the fact that Segovia had driven away from Aguilar and was no longer interacting with him, Aguilar deliberately moved closer to Segovia and fired the gun at Segovia's head. (See *People v. Gomez, supra,* 6 Cal.5th at p. 283 ["the manner of killing tended to show that Gomez acted with premeditation and deliberation: Acosta and Dunton were shot from close range in the head or neck"]; *People v. Marks* (2003) 31 Cal.4th 197, 230 ["the manner of the killing, a close-range shooting without any provocation . . . or evidence of struggle, likewise demonstrates premeditation and deliberation"].)

In sum, the record discloses evidence in all three *Anderson* categories of motive, planning activity and manner of the killing from which a jury could reasonably find Aguilar's murder of Segovia was deliberate and premeditated. Substantial evidence supports this finding.

> c. *Substantial evidence supports the finding the shooting was committed with the specific intent required by the criminal street gang enhancement[8]*

To obtain a true finding on a criminal street gang enhancement allegation, the People must prove the crime at issue was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) The parties stipulated that Harpys and Hobart are criminal street gangs within the meaning of section 186.22.

As to the first prong, that the shooting was committed for the benefit of, at the direction of or in association with any criminal street gang, Officer Gonzalez testified the shooting occurred in Harpys gang territory and benefitted the Harpys gang by enhancing its reputation for violence and by intimidating rival gangs and potential witnesses. This testimony constituted ample evidence the crime was committed for the benefit of a criminal street gang. (see *People v. Vang* (2011) 52 Cal.4th 1038, 1048 ["'[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support [a] . . . gang enhancement"].)

Having concluded the shooting was gang-related, there was compelling evidence to support the findings Aguilar and Rios committed the shooting with the specific intent to promote,

---

[8] Aguilar does not contest the sufficiency of the evidence to support the criminal street gang enhancement on his conviction of being a felon in possession of a firearm.

16

further or assist criminal conduct by gang members.[9]  Aguilar and Rios unquestionably intended to promote or assist each other's criminal conduct in shooting Segovia—Rios by directing Aguilar to shoot Segovia and Aguilar by complying.  As for their gang membership, Officer Gonzalez testified Aguilar and Rios had tattoos identifying them as members of Hobart and Harpys, respectively.  Valente testified he believed Aguilar was a member of Hobart and Rios was a member of Harpys based on statements made to him by Rios.  This evidence supported the finding Aguilar was a member of the Hobart gang and Rios was a member of the Harpys gang.

Aguilar and Rios contend the prosecution failed to establish the elements of the gang enhancement because it failed to prove the distinct Harpys subset to which Rios belonged was the same gang as Harpys in general.  Relying on *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), Aguilar and Rios argue, "[W]here the evidence in support of a gang enhancement involved two different groups, the prosecution must prove an 'associational or organizational connection uniting' them.  [¶]  [I]n this case the prosecution had to present sufficient evidence—apart from

---

[9]  Aguilar and Rios argue the specific intent element was not met because there was insufficient evidence they had the "specific intent to further, assist or promote a criminal street gang."  However, the statute does not require a defendant to have the specific intent to benefit the gang, but only to "promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1) & (b)(4); *People v. Albillar* (2010) 51 Cal.4th 47, 67 ["[t]here is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*"].)

17

[Rios's] tattoos—from which the jury could infer that the 5th Avenue clique was *unified in act and deed with Harpys*."

It is not clear how Aguilar and Rios believe their argument is relevant to application of the enhancement in this case, but, regardless, it is based on a fundamental misunderstanding of the Supreme Court's holding in *Prunty*. In *Prunty* the Supreme Court considered "what type of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets." (*Prunty*, *supra*, 62 Cal.4th at p. 67.) The prosecution in that case presented evidence the defendant identified as a member of the Norteño gang. However, the evidence of predicate offenses offered by the prosecution pertained to activities of two subsets of the Norteño gang. The prosecution's expert did not "offer any specific testimony contending that these subsets' activities connected them to one another or to the Sacramento Norteño gang in general." (*Ibid*.) The Court held this lack of a connection between the subsets and the larger "umbrella" gang precluded application of the criminal street gang enhancement, explaining, "[W]hen the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets." (*Id*. at pp. 67-68; see *id*. at p. 81 ["the prosecution must show that the group the defendant acted to benefit, the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same"].)

Contrary to Aguilar and Rios's assertion, *Prunty* does not apply where, as here, the prosecution need not establish predicate offenses of the gang because the parties have stipulated the gang exists and meets the statutory definition of a criminal street gang. (See *Prunty, supra*, 62 Cal.4th at pp. 67-68 & p. 71, fn. 2; *id.* at p. 91 (conc. & dis. opn. of Corrigan, J.) ["The issue we address is a narrow one. It arises only when the prosecution seeks to prove a street gang enhancement by showing the defendant committed a felony to benefit a broader umbrella gang, but seeks to prove the requisite pattern of criminal gang activity with evidence of felonies committed by members of subsets to the umbrella gang. Our decision is limited to that factual scenario"].)

Here, as discussed, there was substantial evidence Rios was a member of Harpys, stipulated to be a criminal street gang; Aguilar was a member of Hobart, also stipulated to be a criminal street gang; the murder was committed for the benefit of the Harpys gang; and Rios and Aguilar acted with the specific intent to assist each other (gang members) in their criminal conduct. Nothing more is needed to prove the criminal street gang enhancement under section 186.22. (See *People v. Garcia* (2016) 244 Cal.App.4th 1349, 1369-1370 [substantial evidence supported finding of specific intent to assist gang members in criminal activity even though defendants were members of different gangs]; see also *People v. Albillar* (2010) 51 Cal.4th 47, 68 ["if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members"].)

### 2. *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence Segovia Was a Marine*

Prior to trial Aguilar and Rios requested exclusion of testimony that Segovia was a member of the United States Marine Corps. on weekend leave at the time of the shooting. In overruling their Evidence Code section 352 objections, the trial court noted there had been significant media coverage of the murder, including a request to have cameras in the courtroom during trial, most of which coverage had referred to the victim as a Marine. If the jurors were unaware Segovia was a Marine, the court reasoned, they would not know to avoid news coverage regarding the trial of the killing of a Marine and might inadvertently violate their obligation to avoid such coverage. The court further found evidence of a Marine sticker on the back of Segovia's car and of a Marine bag in the car could be admitted because, if the jury believed Aguilar and Rios had seen the sticker and/or the bag, it might undermine the argument the defendants had been afraid Segovia was a gang member who was going to harm them. The court also permitted a photograph of Segovia in uniform to be shown to the jury but cautioned it should not be shown multiple times to multiple witnesses.

Evidence Code section 352 authorizes a court to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, confusing the issues or misleading the jury. Undue prejudice in this context means "'evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.'" (*People v. Valdez* (2012) 55 Cal.4th 82, 133.) The trial court has

broad discretion to admit or exclude evidence under Evidence Code section 352, and its ruling will not be disturbed unless it is arbitrary or irrational.  (*People v. Mills* (2010) 48 Cal.4th 158, 195; *People v. Williams* (2008) 43 Cal.4th 584, 634.)

Here, the prospective jurors were informed the victim in the case had been a Marine;[10] and during trial, the evidence Segovia had been a Marine consisted of a photograph of him in uniform that was shown to Perez for identification purposes; Perez's testimony Segovia had been on weekend leave at the time of the murder; testimony of the police officer who first responded to the scene of the shooting that he noticed a Marine sticker on the rear window of Segovia's car and a Marine bag in the back seat; and a statement on the recorded jail conversation between Aguilar and Rios in which Aguilar said, "We're fucked. . . . Because, like, they—they think 'Marine.'  You know, Marine and a cop, whatever."

Aguilar and Rios argue the only purpose of this evidence was "to encourage jurors to feel respect, admiration, and greater sympathy" for Segovia based on his Marine status.  However, the trial court weighed the relevance of the evidence against its prejudicial effect and found it was not substantially more prejudicial than probative.  As discussed, the evidence was relevant to whether Aguilar and Rios had known at the time of the shooting that Segovia was a Marine and whether they feared he was a rival gang member.  Given that the jury already knew Segovia was a Marine from voir dire, the three brief and unsensational references to that fact during trial did not result in

---

[10]    Rios does not contest the propriety of the disclosure to prospective jurors that Segovia had been a Marine.

undue prejudice.  (See *People v. Wallace* (2008) 44 Cal.4th 1032, 1059 [testimony about victim's poor eyesight and use of cane not unduly prejudicial where jury already knew of her age and frailty and testimony was "brief and matter of fact"].)

### 3. *The Trial Court Did Not Commit Prejudicial Error in Ruling on Objections to Officer Gonzalez's Testimony*

#### a. *Relevant proceedings*

During cross-examination Aguilar's attorney asked Officer Gonzalez about his training and experience regarding the Hobart gang.  Gonzalez responded his "specific expertise" in the Hobart gang was "very limited."  In response to a question regarding Hobart's size Gonzalez estimated there were fewer than 100 members.  Aguilar's counsel then asked if Gonzalez had read the preliminary hearing testimony of Officer Denward Chin, who had testified as the prosecution's gang expert during the preliminary hearing.  Gonzalez testified he had read the testimony.  Aguilar's counsel proceeded to asked Gonzalez what area Hobart claimed as its territory, at which point the prosecutor objected based on relevance.

Outside the hearing of the jury the court inquired as to why Aguilar's counsel was eliciting background information regarding Hobart given the stipulation that Hobart was a criminal street gang.  Counsel explained he was attempting to establish Officer Gonzalez was not qualified to testify regarding operations of the Hobart gang, its relationship to the Harpys gang or whether committing a shooting in Harpys's territory would benefit a Hobart member.  The prosecutor stated Gonzalez was called as a gang expert generally, as well as an expert on Harpys, but he was not an expert on Hobart.  Aguilar's counsel responded he had been expecting Officer Chin, who was an expert on Hobart, to

22

testify.  Counsel argued Gonzalez's statement Hobart had fewer than 100 members conflicted with Chin's statement Hobart had 50 members, and counsel wanted to question Gonzalez about the discrepancy.  He stated, "I feel I should be able to explore some of the issues that were testified to by Mr. Chin, or else—otherwise find out what the extent of [Gonzalez's] expertise is in this area. . . .  Experts are allowed to rely upon other experts."

The court reminded counsel Officer Gonzalez had said he had read Officer Chin's testimony, but, "He didn't say he relied upon it in forming his opinion. . . .  [H]e said he did not talk to [Chin] about it. . . .  And whether he is relying upon that transcript, I guess you can find out."  The court further told Aguilar's counsel he could ask Gonzalez about his opinions on the relationship between Hobart and Harpys but reiterated Gonzalez was not testifying as an expert on Hobart.

Resuming cross-examination Aguilar's counsel asked Officer Gonzalez generally about the territory claimed by Hobart; but he did not ask any additional questions regarding Gonzalez's experience with Hobart, the basis of his opinions or whether he relied on or referred to Officer Chin's testimony in forming his opinions.  Nor did counsel inquire about how the size or location of the Hobart gang might affect Gonzalez's opinion on the hypothetical given by the prosecution.

b. *Governing law and standard of review*

"In order to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048.)  In general an expert witness may "state on direct examination the reasons for his [or her] opinion and the matter . . . upon which it is based, unless he [or

23

she] is precluded by law from using such reasons or matter as a basis for his [or her] opinion." (Evid. Code, § 802.)  An expert may "*rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so.  Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests. . . .  [¶]  What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 685-686.)

Evidence Code section 721 permits an expert to be cross-examined about "the matter upon which his or her opinion is based and the reasons for his or her opinion."  (Evid. Code § 721, subd. (a).)  "The scope of this inquiry is broad and includes questions about whether the expert sufficiently considered matters inconsistent with the opinion.  [Citation.]  Thus, an adverse party may bring to the attention of the jury that an expert did not know or consider information relevant to the issue on which the expert has offered an opinion." (*People v. Doolin* (2009) 45 Cal.4th 390, 434; accord, *People v. Nieves* (2021) 11 Cal.5th 404, 495 ["'[t]he scope of cross-examination permitted under section 721 is broad, and includes examination aimed at determining whether the expert sufficiently took into account matters arguably inconsistent with the expert's conclusion'"].)

"Although the scope of cross-examination may be extensive, it is not boundless.  Indeed, the trial court has wide discretion in determining the appropriate scope of cross-examination." (*People v. Royal* (2019) 43 Cal.App.5th 121, 149; accord, *People v. Steskal*

(2021) 11 Cal.5th 332 ["'[i]t is settled that the trial court is given wide discretion in controlling the scope of relevant cross-examination'"].) "The defense is typically given wide latitude to test the credibility of [expert] witnesses, but the trial court may still place reasonable limits on defense counsel's inquiries." (*Royal*, at p. 149.)

We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 502; *People v. Homick* (2012) 55 Cal.4th 816, 859; *People v. Royal, supra,* 43 Cal.App.5th at p. 149.)

    c. *The trial court's limited exclusion of questions regarding Officer Chin's preliminary hearing testimony was harmless*

Aguilar argues the court abused its discretion by "prohibit[ing] the defense from cross-examining the gang expert concerning his minimal knowledge about important facets of the Hobart gang . . . ." Specifically, Aguilar contends the court should have permitted Aguilar's counsel to question Officer Gonzalez regarding particular statements from Officer Chin's testimony.

As discussed, Evidence Code section 721 permits an expert to be broadly cross-examined regarding the matters on which his or her opinion is based and the reasons for that opinion. Further, "experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc." (*People v. Sanchez, supra,* 63 Cal.4th at p. 675; see Evid. Code, § 721.) Here, however, as the trial court correctly pointed out, Officer Gonzalez did not testify he had relied on Officer Chin's statements in forming an opinion. Without

establishing Gonzalez relied on or referred to Chin's preliminary hearing testimony in formulating his opinions, the trial court acted within its discretion in limiting defense counsel's questioning concerning those hearsay statements, notwithstanding the broad scope of cross-examination afforded by section 721. (See *People v. Royal*, *supra*, 43 Cal.App.5th at pp. 150-151 [trial court did not abuse its discretion in prohibiting defense counsel from asking prosecution's expert witness about matters upon which the expert did not rely and for which there was no admissible evidence; "[a]lthough the scope of cross-examination is typically broad [citation], this principle does not require a trial court to ignore the rules of evidence"].)

Notwithstanding the court's ruling, Aguilar's counsel could have explicitly asked Officer Gonzalez whether he relied on Officer Chin's testimony and how, if at all, it impacted his opinion regarding the Hobart gang; but he chose not to pursue that line of inquiry. Similarly, the trial court did not restrict Aguilar's counsel from asking whether the extent of the Hobart gang's physical territory or the number of its members might have affected his opinions, including his answer to the prosecutor's hypothetical question. All that was precluded was counsel's attempt to use specific data from Chin's preliminary hearing testimony, none of which Gonzalez had relied on, and all of which was inadmissible hearsay.

Even if the court's ruling was an abuse of discretion, however, it is not reasonably probable the court's minimal restriction on the scope of cross-examination of Officer Gonzalez, who conceded he was not an expert on the Hobart gang,

prejudiced Aguilar.[11]  Gonzalez readily acknowledged he had only limited knowledge and experience with the Hobart gang.  Any further inquiry into this topic, even if the result of the trial court's evidentiary ruling and not defense counsel's trial tactics, would not have added anything of significance to Aguilar's defense to the prosecutor's theory the killing was gang motivated. Ample evidence was before the jury on this point.  (See *People v. Franklin* (1994) 25 Cal.App.4th 328, 337 [exclusion of additional evidence during cross-examination going to the witness's credibility was cumulative and, therefore, harmless].)

4. *The Trial Court Did Not Err by Failing To Instruct the Jury on Accomplice Testimony*

Contending Valente was properly considered an accomplice, Aguilar argues the trial court erred by not instructing the jury with CALCRIM No. 334, which requires the jury to decide whether a particular witness is an accomplice whose testimony must be corroborated.

---

[11]  Because the trial court placed only a limited restriction on Aguilar's counsel's cross-examination of Officer Gonzalez and evidence of Gonzalez's lack of knowledge and experience with the Hobart gang was presented to the jury, we evaluate the evidentiary ruling under the harmless error standard for state law error articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836, not the standard for federal constitutional error in *Chapman v. California* (1967) 386 U.S. 18, 24 that would be used had an erroneous ruling created a fundamentally unfair trial.  (See *People v. Brown* (2003) 31 Cal.4th 518, 545-546 [unless the prohibited cross-examination would have produced a significantly different impression of the witness's credibility, the trial court's exercise of discretion limiting questioning does not violate the defendant's federal constitutional rights].)

Section 1111 provides "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; . . . An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." Accordingly, to be considered an accomplice within the meaning of section 1111, a witness "must act 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'" (*People v. Clark*, *supra*, 63 Cal.4th at p. 606; accord, *People v. Lewis* (2001) 26 Cal.4th 334, 369 ["[a]n accomplice must have "'guilty knowledge and intent with regard to the commission of the crime"'"].) "An accessory, however, is not liable to prosecution for the identical offense, and so is not an accomplice."[12] (*People v. Fauber* (1992) 2 Cal.4th 792, 833-834.)

"If sufficient evidence is presented at trial to justify the conclusion that a witness is an accomplice, the trial court must so instruct the jury, even in the absence of a request." (*People v. Brown* (2003) 31 Cal.4th 518, 555.) "'But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice

---

[12] Section 32 defines an accessory as: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof . . . ."

testimony.'" (*People v. Lewis, supra,* 26 Cal.4th at p. 369; accord, *People v. Boyer* (2006) 38 Cal.4th 412, 466 ["[t]he court need give such instructions only where there is substantial evidence that the witness was an accomplice"].) We review the record de novo to determine whether substantial evidence supported giving a particular jury instruction. (See *People v. Nelson* (2016) 1 Cal.5th 513, 538; *People v. Trujeque* (2015) 61 Cal.4th 227, 271.)

Aguilar argues a finding of Valente's accomplice liability was supported by evidence Valente knew Aguilar was armed, was present at the shooting, believed Segovia was in danger immediately before the shooting, fled after the shooting and initially lied to the police. However, none of this evidence was sufficient to support a finding Valente shared Aguilar's intent to shoot Segovia or intended to encourage or facilitate Aguilar in doing so. (See *People v. Lewis*, *supra,* 26 Cal.4th at pp. 369-370 ["there was no evidence other than speculation that [witness] planned, encouraged or instigated the murder and robbery to give rise to accomplice liability" even though witness had been present and had "intimate knowledge" of the crime]; *People v. Sully* (1991) 53 Cal.3d 1195, 1228 [evidence witness was present during murder did not support inference witness was an accomplice]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 90 ["[n]or is an individual's presence at the scene of a crime or failure to prevent its commission sufficient to establish aiding and abetting"]; see also *People v. Hoover* (1974) 12 Cal.3d 875, 879 [assisting principal to escape does not result in liability as principal or aider and abettor, but merely as accessory]; *People v. Snyder* (2003) 112 Cal.App.4th 1200, 1220 ["[i]t is not sufficient if the person simply gives assistance with knowledge of the perpetrator's criminal purpose. Merely giving assistance without sharing the

perpetrator's purpose and intent establishes liability only as an accessory, not as an accomplice"].)  Because there was no evidence from which the jury could reasonably conclude Valente was an accomplice, the trial court did not err in failing to give an accomplice testimony instruction.

### 5. *The Trial Court's Instructions Regarding Voluntary Intoxication Did Not Constitute Prejudicial Error*

#### a. *Relevant proceedings*

Aguilar and Rios requested the court instruct the jury it could consider evidence of voluntary intoxication in deciding whether they had the specific intent or mental state required to commit first degree murder and whether they had the specific intent necessary for the gang allegation.  Rios also requested an instruction regarding the effect of voluntary intoxication in deciding whether he had the specific intent required as an aider and abettor to either murder or shooting at an occupied vehicle.  The trial court found there was evidence Aguilar and Rios were intoxicated the night of the shooting and, thus, the instructions were warranted.  The prosecutor stated he had no objection.

The trial court gave two instructions on voluntary intoxication.  The court used a modified version of CALCRIM No. 625:  "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant had the specific intent required in a homicide charge as defined in Instructions 520 and 521 or 571.  A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating

30

effect, or willingly assuming the risk of that effect. You may not consider evidence of voluntary intoxication for any other purpose." The court also gave a modified version of CALCRIM 3426: "In addition to the previous instruction relating to voluntary intoxication #625, as to defendant Esau Rios you may consider evidence, if any, of the defendant Rios['s] voluntary intoxication in an additional limited way. You may consider that evidence in deciding whether the defendant acted with the specific intent required as an aider and abettor to either murder or shooting at an occupied motor vehicle. . . ."

b. *Governing law*

A jury may consider evidence of voluntary intoxication "solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).) A defendant is entitled to an instruction on voluntary intoxication only when there is substantial evidence he or she was intoxicated at the time of the crime. (*People v. Williams* (1997) 16 Cal.4th 635, 677.) However, the defendant must request such an instruction; the trial court has no sua sponte duty to give any instruction on the relevance of intoxication. (*People v. Bolden* (2002) 29 Cal.4th 515, 559 ["an instruction on voluntary intoxication . . . is a form of pinpoint instruction that the trial court is not required to give in the absence of a request"]; *People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

"Instructional error that limits the jury's consideration of voluntary intoxication evidence 'is thus subject to the usual standard for state law error [under which] "the court must reverse only if it also finds a reasonable probability the error

31

affected the verdict adversely to defendant.""" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134-1135; accord, *People v. Pearson* (2012) 53 Cal.4th 306, 325, fn. 9 ["[t]he failure to give a fully inclusive pinpoint instruction on voluntary intoxication did not . . . deprive [defendant] of his federal fair trial right or unconstitutionally lessen the prosecution's burden of proof"]; *People v. Larsen* (2012) 205 Cal.App.4th 810, 830-831 ["erroneous failure to give a pinpoint instruction is reviewed for prejudice under the *Watson* harmless error standard"; the question in such circumstances "'is not what a jury *could* have done, but what a jury would *likely* have done if properly instructed'"].)

      c. *Aguilar and Rios have not forfeited their claim of error*

      The Attorney General argues Aguilar and Rios have forfeited their claim of instructional error on appeal by failing to object to the voluntary intoxication instructions that were given. The Attorney General is correct that generally, because the trial court has no sua sponte duty to instruct on voluntary intoxication, failing to raise the issue in the trial court may result in forfeiture. (See *People v. Virgil* (2011) 51 Cal.4th 1210, 1260 [failure to object to instruction forfeits claim on appeal]; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1037 [same].) However, as the Supreme Court has recognized, when a court "does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1012; accord, *People v. Pearson, supra,* 53 Cal.4th at p. 325.) Accordingly, the argument an instruction was legally incorrect is not forfeited for failure to object in the trial court. (See *People v. Capistrano* (2014) 59 Cal.4th 830, 875, fn. 11 ["[w]here, however, defendant asserts that an instruction is incorrect in law an objection is not required"]; *People v. Smith*

32

(2017) 12 Cal.App.5th 766, 778, fn. 5 [no forfeiture of argument that instruction incorrectly stated the law].)

Here, Aguilar and Rios do not merely argue an instruction tying intoxication to the gang enhancement was omitted; they argue the intoxication instructions as given were legally incorrect. We agree. The jury was specifically told it could not consider intoxication for any purpose other than intent and state of mind in relation to the murder charge or, as to Rios, intent to aid and abet. The instructions affirmatively and erroneously precluded the jury from considering the intoxication evidence in connection with the specific intent required for the gang enhancement. Failure to provide complete and accurate instructions was error.

d. *The error was harmless*

Aguilar and Rios have not established a reasonable probability that they would have obtained a more favorable result had the jury been instructed it could consider evidence of intoxication in connection with the gang enhancement. The jury rejected the notion Aguilar and Rios were too intoxicated to form the specific intent necessary for first degree murder and aiding and abetting. There is no reasonable basis on which to find they could have been simultaneously incapable of forming the specific intent to assist one another in criminal conduct. (See § 186.22, subd. (b).) In fact, the finding Rios was able to form the specific intent to aid and abet Aguilar in shooting Segovia necessarily requires a finding he was capable of forming the specific intent to assist or promote a gang member in criminal conduct. Likewise, having found Rios told Aguilar to shoot Segovia and having found Aguilar complied, the jury necessarily found Aguilar intended to

assist a gang member in criminal conduct.  The instructional error was harmless.

6. *Aguilar and Rios Forfeited Their Prosecutorial Misconduct Argument and Have Not Established Ineffective Assistance of Counsel*

a. *Governing law and standard of review*

""""A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.""""  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331-1332; accord, *People v. Cortez* (2016) 63 Cal.4th 101, 130.)  Bad faith by the prosecutor is not required.  (*People v. Hill* (1998) 17 Cal.4th 800, 821.)  In this regard, "'[t]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.'"  (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667 (*Centeno*); see *People v. Sandoval* (2015) 62 Cal.4th 394, 438.)

A prosecutor enjoys wide latitude in commenting on the evidence, including identifying reasonable inferences derived from the evidence.  (See *People v. Edwards* (2013) 57 Cal.4th 658, 736 ["[a] prosecutor's 'argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom'"]; *People v. Hill*, *supra*, 17 Cal.4th at p. 823 [same].)  Comments that go beyond the evidence to appeal solely to the passions or prejudices of the

jury are not permitted.  (See *People v. Redd* (2010) 48 Cal.4th 691, 742 ["'[i]t is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response"'"]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1130 ["'[a]n appeal for sympathy for the victim is out of place during an objective determination of guilt'"].)  Nor may a prosecutor engage in "personal attacks on the integrity of opposing counsel." (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215.)  "Ultimately, the test for misconduct is whether the prosecutor has employed deceptive or reprehensible methods to persuade either the court or the jury." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

The failure to object and request an admonition forfeits the issue unless "the prosecutor's argument [was] so extreme or pervasive that a prompt objection and admonition would not have cured the harm." (*Centeno, supra,* 60 Cal.4th at p. 674; accord, *People v. Charles* (2015) 61 Cal.4th 308, 327 ["'"[t]o preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument"'"].)

When the issue has been preserved, we review a trial court's ruling regarding prosecutorial misconduct for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)  A defendant's conviction will not be reversed for prosecutorial misconduct that violates state law "'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'" (*People v. Wallace,*

*supra*, 44 Cal.4th at p. 1071; accord, *People v. Lloyd* (2015) 236 Cal.App.4th 49, 60-61.)

### b. *The prosecutorial misconduct argument has been forfeited*

Aguilar and Rios argue the prosecutor committed misconduct during his closing argument by improperly eliciting sympathy for Segovia. The prosecutor showed the jurors a photograph of Segovia in his Marine uniform and a photograph of Segovia wearing a shirt with the words "Got Compassion" written on it. The prosecutor told the jury these photographs were two of his "favorites" from the trial, and he referred to Segovia as a "compassionate protector." Aguilar and Rios also contend the prosecutor improperly disparaged defense counsel by stating their arguments were unreasonable and telling the jury defense counsel was "trying to mislead you" and was "trying to twist the law."

Neither Aguilar's nor Rios's counsel objected to any of the statements now identified as misconduct. Accordingly, the argument has been forfeited. (*People v. Charles, supra,* 61 Cal.4th at p. 327; *People v. Williams* (2013) 58 Cal.4th 197, 274.)

### c. *Aguilar and Rios have not demonstrated their trial counsel were constitutionally ineffective*

Acknowledging counsel's failure to object in the trial court may lead to the argument being forfeited, Aguilar and Rios contend their trial counsel was ineffective in not objecting to the prosecutor's remarks. "'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.'" (*Centeno, supra,*

60 Cal.4th at p. 674; accord, *People v. Lopez* (2008) 42 Cal.4th 960, 966.)  To prevail on their claim of ineffective assistance of counsel, Aguilar and Rios must demonstrate their counsel's performances were deficient because they fell below an objective standard of reasonableness under prevailing professional norms and, because of those deficiencies, there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland v. Washington* (1984) 466 U.S. 668, 694; accord, *Centeno*, at pp. 674, 676.)

      "'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."'  When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was ""no conceivable tactical purpose"' for counsel's act or omission.'  '[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one,' and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence.'"  (*Centeno*, *supra*, 60 Cal.4th at pp. 674-675, citations omitted; accord, *People v. Jackson* (2016) 1 Cal.5th 269, 349.)

      Here, while the prosecutor's statements regarding Segovia's character may have improperly invoked the jury's sympathy, the remarks were fleeting.  Further, the prosecutor's statements about defense counsel's theory of the case did not misconstrue the evidence or attack defense counsel's integrity.  (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 31-32 [prosecutor's argument that the defense's portrayal of the defendant as a victim

constituted an "'attempt to distract'" the jury from the "'real victims'" and "that the jury should '[l]et that disingenuous attempt fall on deaf ears'" was proper and did not "improperly impugn[ ] defense counsel's integrity"].)  It is entirely possible defense counsel elected not to object to expedite argument and avoid continued emphasis on the prosecutor's interpretations of evidence.  At the very least, on this record, which is silent on counsel's reasons for not objecting, we cannot say there was no conceivable tactical reason for counsel's failure to object to the remarks Aguilar and Rios now challenge on appeal.

> 7. *Aguilar Has Failed To Demonstrate Cumulative Error Compelling Reversal*

Aguilar contends the errors he described, at least when considered cumulatively, compel reversal.  For the reasons we have explained, none of the errors alleged deprived Aguilar of a fair trial.  (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1382 [no cumulative error where court "rejected nearly all of defendant's assignments of error"].)

## DISPOSITION

The judgment as to Rios is affirmed.  The judgment as to Aguilar is modified to reflect minimum parole eligibility of 15 years on the murder count.  As modified, Aguilar's judgment is affirmed.  The trial court is to prepare a corrected abstract of judgment for Aguilar and forward it to the Department of Corrections and Rehabilitation.

                                        PERLUSS, P. J.

We concur:


        SEGAL, J.


        McCORMICK, J.*

---

*        Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.